Mr. White, would you like to come forward? We'd be happy to hear from you. Yes, Your Honor, and may it please the court. My name is Jack White, and along with my co-counsel, Kevin Burns, who was also counsel below, I represent appellants Derek and Lisa Kitlinski. This case is about preventing government agencies from using their quasi-criminal investigative functions to intimidate employees in the midst of legitimate, ongoing investigations, particularly when it runs afoul of DeSera. To that end, this court should reverse the decision of the district court for the following two reasons. First, the district court erred in disregarding genuine issues of material fact and granting summary judgment in favor of the government. And second, on de novo review, the undisputed facts here should lead this court to grant summary judgment in favor of Derek and Lisa Kitlinski. Now, at the outset, Your Honors, this court's analysis of the events that led to the respective wrongful terminations of Derek and Lisa Kitlinski should be undertaken in light of ongoing litigation that was brought by Mr. Kitlinski against the DEA. Inadvertently or otherwise, the government has clogged the record with the suggestion that the ongoing litigation either was already resolved, which it was not, or was immaterial, which it is not. As a matter of fact, the BlackBerry device that the Kitlinskis were sought to be questioned on was found on Lisa's vehicle in the midst of the underlying litigation that was ongoing by Derek against the agency. And this was the very topic that the agency wished to question both Derek and Lisa on under oath and terminated them for not participating in this sworn deposition. Now, to my first point, the district court erred in disregarding genuine issues of material fact. Those issues focus on the authority that the DEA had over Derek to even call him in for questioning. Now, in order to appreciate that authority, it's important to be mindful of the applicable statutory scheme, the Uniformed Services Employment and Reemployment Rights Act was passed and subsequently strengthened because we are a nation that has been at war for nearly two decades. And the basic purpose of the statutory scheme is to ensure that service members who leave their civilian employment and serve honorably in support of the mission of the United States military have the assurance that once their service is completed, they will be able to return to their civilian careers with as little disruption and difficulty as possible. Here, calling Derek to testify disrupted his military service. Moreover, the agency had no authority to call him in to do so. Are you saying that the investigation is beyond the authority of the Office of Professional Responsibility? It would seem to me if there was a BlackBerry placed under the hood of Lisa's car, and the BlackBerry was of unknown origin, that the agency might want to look into it. And the government contends here that Lisa actually asked the DEA to initiate an investigation. So isn't the Office of Professional Responsibility operating within the gambit of its authority? It seems to me it would be something you would want the agency to look into and find out what was going on. And especially so since Lisa, it seems, was the one that asked DEA to initiate this. Judge Wilkinson, a legitimate investigation of the placement of this BlackBerry was well within the rights of the agency. But that is not what was going on here. What was going on here was that the agency was seeking to interrogate both Lisa and Derek while Derek was on active duty. Now, the investigation could have gone on while Derek was on active duty. And if the agency really wanted to question Lisa, then subsequently they could have called her in for questioning. That did not happen. As a matter of fact, as soon as Derek returned from active duty and was available for a sworn deposition, the agency could have done so. They did not. Instead, they sought to question him while he was on active duty. And he did not participate because he was on active duty. When he returned to his post at the DEA, he was terminated because he did not participate while he was on active duty. Mr. White, this is Judge Floyd. I thought from the record that the Coast Guard cooperated with the DEA to carry out this interview. Am I wrong about that? Your Honor, respectfully, that is not accurate. What happened was the DEA sought admission into the location where Mr. Kiblinski was and spoke with certain officials from the Coast Guard who worked on getting them security access. But no one within the Coast Guard had authority by statute to order Derek to leave his post while he was on active duty. We're not talking about ordering him to do something. The question is, did the Coast Guard forbid him from going or did they intervene in any way? I mean, why could he not go and participate in the interview? Your Honor, I understand the question. Why could he not leave his post? But the problem there is under USERRA, he was protected from having to leave his post altogether. A hypothetical, a brief hypothetical, and I'll be expeditious, but it might illustrate the point. Let's say that Derek was not – it's just a matter of geography and convenience that Derek was located in Washington, D.C. during this time period. Let's say that instead of being in D.C., he was on a Coast Guard cutter patrolling offshore waters in southwest – to use his personnel to assist a federal agency. And what it envisions is a cooperative relationship between the Coast Guard and DEA here. And just to follow on Judge Floyd's good question, I don't see the Coast Guard interpreting any objections to this. In other words, I don't see any reason why he couldn't have gone and been minimally cooperative in the investigation, especially since Lisa had asked for DEA to initiate it. And also, if they're going to investigate, if the OPR is going to investigate, Derek and Lisa would appear to be the people whose testimony and interview would be among the most relevant to carry out the investigation. If you don't get the chance to talk to them, you've hollowed out the investigation to the point that it's pretty meaningless. So, Judge Wilkinson, talking with Derek and Lisa Kiblinski may very well have been pivotal to the investigation. And if the agency really wanted to do that, then it could have done so when Derek was not on active duty. As to the Coast Guard enabling statute, the specific language of the statute says that the authority of any officer is limited to, quote, duty authorized by law for members of the regular component. Now, the Coast Guard did not have the authority to have him go and testify in an investigation with the DEA. It also didn't have the authority to deny him from doing so under the enabling statute because this type of activity was not authorized, duly authorized by law within the confines of his duties as a Coast Guard officer. As to the fact that Lisa raised the issue, Your Honor, I think it's important to point out that Lisa did cooperate with the interrogation that she was subjected to. She was asked numerous questions, all of which she answered, save those questions that she reasonably believed were protected by the attorney, by the spousal privilege and by her rights under USERRA. Because USERRA, the statute under Section 4311B, protects her as well because she is, quote, taking an action to enforce a protection afforded any person that being Derek under this chapter and, quote, testifying or otherwise making a statement in or in conjunction with any proceeding under this chapter. I think it's important to appreciate that the questioning that was going on was related to litigation that was ongoing and was brought by Derek. And the attempts of the agency here were to circumvent the investigative process of the litigation that was ongoing and run roughshod on that and get straight to Derek and Lisa by compelling them to testify when the agency not only had no right to do so, but doing so was in violation of the statute. For the reasons that I've set forth here and those set forth in our briefs, we respectfully request that the decision of the district court be reversed. Thank you, Your Honor. We thank you. And we will hear from Miss Kimball at this point. Thank you, Your Honor. May it please the court, this is a case in which two DEA supervisory employees, one a supervisory drug enforcement agent and the other a forensic chemist, flatly refused to cooperate with an internal investigation by DEA's Office of Professional Responsibility, or OPR, which is the DEA equivalent of a police force's internal affairs. Like every other DEA employee who has refused to cooperate with an internal investigation in comparable circumstances, who didn't simply resign, plaintiffs were fired. And even more egregiously, as this court pointed out, the internal investigation here is an investigation that plaintiffs themselves asked OPR to commence. They told OPR that they had discovered a DEA-issued BlackBerry on their vehicle and that they believed someone at the DEA was illegally surveilling them. But then after initiating the investigation, they did everything they could to impede the investigation until ultimately the DEA fired them for failure to cooperate. After months of discovery in which plaintiffs tried to uncover any evidence whatsoever of an illegal motive of any kind for their terminations, the record demonstrates that none exists. In fact, the district court correctly held, and plaintiffs have not challenged in any of their briefing, that every single one of the facts identified by defendants in their summary judgment briefing, including those facts regarding the non-discriminatory, non-retaliatory reasons for plaintiffs' terminations, was undisputed. In short, the district court correctly held that there is simply no evidence that any retaliatory animus based on USERRA or Title VII protected activity had any role in plaintiffs' terminations. Plaintiffs were fired because they were law enforcement employees who refused to cooperate with an internal investigation. I will address plaintiffs' arguments that their terminations were retaliation for Title VII protected activity first, and then their claims that their terminations were motivated by their USERRA activity. Then their arguments that they were somehow entitled to an evidentiary hearing, despite the fact that they did not dispute any of the material facts. And finally, I will address plaintiffs' arguments that the district court erroneously excluded, erroneously prohibited them from reopening Discovery months after it had closed, and precluded them from deposing the DOJ Inspector General. First, with respect to plaintiffs' claim that their terminations were motivated by Title VII animus, plaintiffs have failed to establish that their terminations resulted from any Title VII retaliation. First and foremost, plaintiffs never even contested summary judgment on their Title VII terminations before the district court, and this court should not consider this claim for the first time here. Second, plaintiffs never identified any evidence showing that their Title VII protected activity had any role in any disparate treatment they received in their terminations. And in fact, the record demonstrates that every DEA employee who refused to cooperate with an internal investigation was terminated or resigned while the termination was pending. And third, the DEA had legitimate, non-retaliatory reasons for their terminations, and plaintiffs have never established that those were pretextual. As a forensic chemist and supervisory agent, plaintiffs' job series were two of the most mission-critical for the DEA. Mr. Bolgren explained that these types of jobs were held to the highest standard of conduct, and as senior supervisory-grade employees, plaintiffs were also held to the highest standard of conduct. Mr. Bolgren explained that supervisory employees stand as an example to more junior employees and thus must be required to participate in and fully cooperate with an internal investigation. Although plaintiffs now argue that the investigation itself was Title VII retaliation, they didn't argue that before the district court, and there is no evidence that they have identified, even on appeal, that the Title VII investigation was motivated in any way by their Title VII protected activity. As such, because plaintiffs have failed to establish that Title VII had any role in the investigation or their terminations, this court should affirm summary judgment of their Title VII claims. With respect to their claims regarding USERRA, plaintiffs have failed to establish that Mrs. Kitlinski was terminated for any USERRA-protected activity. To establish a USERRA claim, plaintiffs must establish that Mrs. Kitlinski engaged in USERRA-protected activity and that that protected activity was a motivating factor in her termination. If she establishes those two elements, the government must establish that it would have terminated her regardless of the protected activity. Here, Mrs. Kitlinski did not engage in any USERRA-protected activity. Although they now try to argue that her OPR interview was protected activity, it is not. 38 U.S.C. 4311 paragraph B expressly identifies what constitutes protected activity under USERRA, and nowhere in the cited examples of protected activity does it say that an employee can refuse to answer questions in an investigation that she herself began. It simply is not protected activity. And although plaintiffs cited in their briefs to Laughlin v. Emwa and Anderson v. Index Journal Company to try to shoehorn her interview into protected activity, those cases are Title VII cases, not USERRA cases, and USERRA explicitly identifies what valid protected activity under this statute is. Moreover, those cases make clear that oppositional activity can be making statements opposing discrimination short of bringing a claim of discrimination or being a witness in a lawsuit, but that's not what happened here. Not once during the entirety of her interview, which is at Joint Appendix 753 to 808, does Mrs. Kitlinski mention discrimination against any military members or retaliation or USERRA or even identify any claim that she or her husband had brought under USERRA. Mrs. Kitlinski's refusal to answer questions simply is not protected activity. Nothing in USERRA authorizes an employee to use the statute as both a sword and a shield, as the Kitlinskis did here. They cannot request that the agency investigate potential wrongdoing that they alleged had been committed against them and then invoke USERRA to refuse to aid in the investigation that they themselves started. Second, the record demonstrates that Mrs. Kitlinski's termination was not motivated by any USERRA-protected activity. She was terminated because she refused to answer questions in an investigation, and specifically the questions identified in the Notice of Proposed Termination at Joint Appendix 1059 through 1064. She refused to acknowledge that she had read forms providing to her advising her of her rights and responsibilities in the investigation. She refused to tell the investigators what she personally had done after discovering the BlackBerry. She refused to tell the investigators what her supervisors had told her to do regarding the BlackBerry. She refused to tell the investigators what the department of Justice Office of Inspector General had told her to do regarding the BlackBerry. She refused to answer whether OPR had told her to return the BlackBerry, and she refused to return the BlackBerry after both her supervisors and OPR told her she had to do so. Although she refused to respond to these questions on the basis of attorney-client or spousal privilege, no one could have believed that either of those privileges applied to these questions, which related solely to what Mrs. Kietlinski had done and to what people other than her spouse and her attorney had discussed with her. Moreover, there is literally nothing in any of these questions or anything in the investigation itself that suggests that the investigation had any basis in an attempt to discover anything going on in her litigation, which at the time was not even existent. The USARA litigation had been dismissed before her interview and had not been reinstituted at the time of her interview. Moreover, none of the questions that they asked her had any role in trying to undercover what any sort of litigation strategy was or anything along those lines. The questions made clear that the investigators were trying to figure out what had happened with the BlackBerry. And Mr. Bolgren explained that he terminated Mrs. Kietlinski because she refused to cooperate with the investigation. He explained that her job series and seniority required her to be held to the highest standard of conduct and that her misconduct threatened the integrity of the office because internal investigations are vital to maintaining that integrity. Internal investigations are the primary way that a law enforcement agency ensures the integrity of its law enforcement actions. They're critically important to DEA's mission and plaintiffs were fired because they flatly refused their obligation to cooperate with the investigation. And finally, Mr. Bolgren's testimony demonstrates that he would have terminated her regardless of whether any USARA protected activity existed. Every DEA employee who was engaged in similar misconduct had either been terminated or resigned while a termination was pending. As such, summary judgment should be affirmed with respect to Mrs. Kietlinski's USARA claim. Plaintiffs have also failed to establish that Mr. Kietlinski was terminated for his USARA protected activity. Again, plaintiffs must establish that Mr. Kietlinski engaged in USARA protected activity and that that activity motivated his termination. If he establishes that, the government must establish that it would have terminated him regardless of that activity. Here, Mr. Kietlinski was terminated for refusing to show up for his OPR interview after OPR had expressly coordinated with the Coast Guard to ensure his ability to attend, consistent with his military duties. Critically, as this court noted, there is nothing about Mr. Kietlinski's military duty that precluded him from attending the interview. The Coast Guard had expressly helped arrange the interview. Mr. Kietlinski testified that he first learned of the interview from the Coast Guard. And when Mr. Kietlinski learned of the interview, the Coast Guard even told him that he could have the OPR agents come to the Coast Guard if that would be easier for him. But he didn't even make that option available to OPR. He testified that he just refused to be interviewed, and the record demonstrates that as well. Mr. Kietlinski plainly remained a DEA employee while he was on military duty, and he behaved as such when it suited him. He had no problem leaving his post to hand deliver a DEA transfer request to the DEA in Arlington, to appear at an EEO interview at the DEA headquarters in Arlington, to attend an MSPB hearing regarding his DEA employment in San Francisco. Only when the Coast Guard and the DEA had made arrangements for him to attend the OPR interview did Mr. Kietlinski suddenly and unilaterally decide that he could not leave his post. The DEA handbook explains that DEA employees have an obligation to work with both the military and the DEA in good faith to ensure that the needs of the agency are met. And federal regulations for federal civilian employees on active reserve duty also make clear that a federal civilian agency can raise a need for a particular civilian employee with the military branch that that employee is on active duty with, and the military and the agency work together to work it out. That's at 5 CFR 353.203 paragraph C. This is not a case where Mr. Kietlinski was fired because he was on military leave, like an Erickson U.S. Postal Service, or a case where he was not promoted because he had taken too much military leave, like Hayden v. Air Force. This is a case where Mr. Kietlinski unilaterally decided not to cooperate with an internal investigation that he and his wife had initiated after the Coast Guard had worked with the DEA to accommodate it. This is simply another attempt of the plaintiffs attempting to use USERRA as both a sword and a shield, insisting that the federal government investigate their allegations that somebody had illegally used a BlackBerry, and then trying to use USERRA to preclude the investigators from taking the most critical of investigating steps, interviewing the only two known witnesses in the circumstance. Second, the record makes clear that neither Mr. Kietlinski's military service nor any USERRA-protected activity motivated his termination. He was terminated because he refused to attend the interview after the Coast Guard had helped to set it up. Mr. Bolgren explained that Mr. Kietlinski's job series as a drug enforcement agent, and the fact that he was a senior supervisory employee, required that he be held to the highest standard of conduct, which required him to participate in the investigation. And because plaintiffs failed to contest the fact that these reasons were the reasons for Mr. Kietlinski's termination at summary judgment, the district court deemed these facts admitted. And plaintiffs do not challenge here that these were the reasons for his termination. Finally, even if plaintiffs could establish that Mr. Kietlinski's USERRA-protected activity had any role in his termination, defendant has fully established that Mr. Kietlinski would have been terminated regardless of his military service. All employees who refused to participate in an internal investigation were terminated or resigned while their terminations were pending. Again, plaintiffs admitted this fact at summary judgment and do not challenge it here. As such, the court should affirm summary judgment on Mr. Kietlinski's USERRA claim. All right, thank you, Ms. Kimball. If any of my colleagues have any questions, I'd be happy to have them ask it. Judge Groh, do you have any questions? No, not for Ms. Kimball.  Judge Floyd, do you have any questions? No, sir. All right, I have no questions either. Thank you very much, Ms. Kimball. Thank you. All right, Mr. Burns, you have some time for rebuttal. We'd be pleased to hear from you. Thank you, Judge. Thank you all. I think the problem with the government's argument is its premise, which is that Lisa Kietlinski initiated an investigation and that both she and her husband refused to cooperate. The actual factual predicate is that there was a series of cases going on against the DEA by the Kietlinskis, including USERRA and EEO claims. When the BlackBerry was discovered, it was discovered after Mr. Kietlinski had testified at EEO headquarters. Mr. Kietlinski reported this to the FBI as a criminal violation. And we know that that has residence because the Federal Circuit, when addressing this issue on whether or not a cellular telephone's placement could be retaliation, said that that right arises under the Constitution for any citizen. So Mr. Kietlinski went to the FBI. The FBI didn't respond. He went to the Office of Inspector General, was told they were going to investigate. Then the Inspector General's office, their special agent in charge called Herman Whaley, told him about the phone. And the DEA began looking into not how the phone, who put the phone in the Kietlinski's car, but how the Kietlinski's discovered it, which is fairly clear from the investigative questions that were asked. The significant issue that's missing in the government's argument is that the Kietlinski's were complainants against the agency itself. They had a series of administrative claims going, and they had reported the agency's conduct to both the FBI and the OIG. That is why we wanted to talk to the Inspector General himself as to how this case got transferred to the DEA, because our presumption was that that was done by Herman Whaley speaking with the special agent in charge and transferring a case to the OPR. So the OPR investigation, which if you go back and look at the sheet, simply says investigation, doesn't even tell what it's about. The OPR investigators focused on, in questioning Ms. Kietlinski, how she discovered the phone, what her communications with her attorney were, what her communications, as the government just admitted, with the Office of Inspector General were, which is actually protected activity in and of itself. So when Lisa Kietlinski supposedly reported this, she reported it to a supervisor as a friend, and the agency had already begun investigating it independently. So the question then becomes, can an agency use its quasi-law enforcement power to force witnesses in an ongoing administrative case to come in and disclose the contents of that administrative investigation, the contents of their discussions with their attorneys, and the actions of their attorneys to an agency? And we think that under 5 U.S.C. 555 and under the statutes that exist, the answer to that is no. The second thing is USARA is not dependent on the geography of Mr. Kietlinski, nor is it dependent on the voluntariness of his cooperation. The government continues to assert a false fact that the Coast Guard agreed to make Mr. Kietlinski, quote, present. All that happened was two DEA agents went over to the Coast Guard, represented themselves on a sheet of paper as Coast Guard employees, and were given authorization by a lieutenant commander on the security detail to simply talk to Mr. Kietlinski about matters the lieutenant commander did not know. And the agents then came in and ordered Mr. Kietlinski to come off active duty. Mr. Burns, there's a larger question here, I think. And the way you frame it, it's almost as if the Office of Professional Responsibility had no authority to do anything. It seems to me you would throw up roadblock after roadblock. And I think stepping back for a moment, it's very important that government agencies in law enforcement, such as the FBI and the DEA, be able to investigate wrongdoing in their own ranks. It can be a real problem if there's an absence of integrity or lawbreaking or underhanded conduct within a law enforcement agency itself. Because there would be a loss of public trust and an impairment of the mission. And my general concern here is that by raising one objection after another, you almost tie the hands of law enforcement in being able to root out internal problems. I think we know that sometimes these agencies become very insular and they need someone to take a broom to them and to find out what's going on. And you're coming close to saying that they can't even interview the people whose comments would be the most relevant. I don't think they were trying to broach any spousal privilege. They were simply trying to find out what was behind the BlackBerry and why this was there, which she wanted looked into. And it just seems to me that you would be that what you're suggesting could be very damaging to the efforts of government agencies to really to run a clean shop and to get to the root of problems. That can fester in these agencies. If I may respond, Judge, I don't disagree with that, which is why we wrote letters to the DEA saying the DEA attorney, when we wrote her and questioned her about this and what we should do, she said everything needs to be litigated within the administrative process. So that's precisely what we did. When Derek Kedlinski was questioned, we did not object to him being interviewed. We objected to him being called off active duty without approval from his supervisor. And we objected to his attorney not being able to be present during that questioning because Mr. Kedlinski already had litigation against the agency. The way to resolve this amicably and reasonably would have been for the agency to respond to that request and say, Mr. Burns, please bring your client over because we know he's in an administrative claim. That would have not impeded their investigation in any way, shape or form. If Lisa Kedlinski had been able to have me present because they questioned her while her husband was in a proceeding in San Francisco in which the senior most DEA officials themselves testified, including Michelle Lenhart, that agent consciously chose that date because I was not present. And had I been present, we could have addressed all of those questions that weren't answered, which we did when we were in front of Mr. Bulgarin. The issue is not whether the agency can investigate. The issue is when a litigant has ongoing administrative claims or judicial claims against an agency, can an agency use its law enforcement authority to call that witness in without counsel and simply pepper them with questions about their underlying allegations? Whatever, whatever that might be. I wonder if we're not wandering fairly far afield from the subject of the complaint, which was that there was somehow anti-military animus that motivated this whole thing. I'm having difficulty. Well, obviously, you've got problems with the agency. You know, fair enough. But I don't understand how anti-military animus even gets into that. It seems to me that most of the problems with the agency are, whatever they may be, are somewhat far afield from the Uniformed Services Employment Act. And I'm having a hard time seeing how there was any anti-military animus. The Coast Guard wasn't objecting. But the Coast Guard, the person at the Coast Guard, the only thing the Coast Guard granted, I want to get that clear. The only thing the Coast Guard granted was the access of the agents to go talk to Mr. Gudlinski. They didn't grant him access to leave his post. They didn't direct him to leave his post. And when I wrote to the agency and said, look, he's doing military service. You know, can we work this out? They did not respond at all. They did not cooperate in that. So my point is that his military status was he was on active duty. The act itself says it's an Employment and Reemployment Act, that while Mr. Gudlinski is on active duty, he is not the employee of the Coast Guard. And I just, I know I'm out of time. Mr. Burns? Yes. This is Judge Sgro. Specifically, how would Mr. Gudlinski's service in the Coast Guard have been disrupted? Or how would the Coast Guard's business have been disrupted if he had simply appeared for the deposition? It was the thing is they gave him one day's notice. He said, come by tomorrow. And that's what we objected to. We said that is unreasonable for you to demand to leave his post on a day's notice. I mean, I think those facts get lost in this, that there were real attempts to work out with the agency a reasonable mechanism for them to be able to interview the Gudlinski's while preserving the Gudlinski's rights so that the agency couldn't interfere with discovery or the administrative procedures and litigation against them. And that would have been quite simply to have me present. The problem with Mr. Gudlinski is that when he's on active duty service, it's the Employment and Reemployment Act. Because while he's on active duty service, the statute says he's not employed by an employer. If you find that they can do this, then that sets a precedent that any civilian or government employer can simply go over to somebody on active duty, demand they come and do the agency's bidding. And Congress decided that is not how USERRA works. It protects the reservist status and it protects the active duty status of military members because of the necessity of their function. The Coast Guard is not objecting here. And the opposing counsel points out that he left his active duty status to come across the country or do whatever on a number of occasions. Now, if there had been some kind of objection from the Coast Guard, it would be something else. But its enabling statute says this, you know, that they should use its personnel, the Coast Guard should use its personnel to assist and cooperate with any federal agency. And one of the difficulties that I had was both with respect to Derek and Lisa, and I don't guess Lisa's even in the military, is that there were no steps here that seemed to lead toward cooperation. It was just a flat refusal to attend the interview or to produce the BlackBerry, at least initially. Derek and Lisa even refused to produce the BlackBerry. The problem is the record suggests there was just an absolute stonewall. No, Judge, I think, and I'm over time, so I want to be able to answer this question. There wasn't a stonewall. If you look at the record, the government attorney, Letitia Pinckney, told me when I protested these actions that all of these matters had to be handled within the administrative case. We filed motions in those cases. We would have presented the BlackBerry to them in the course of discovery. We would have answered questions at a deposition. We would have returned and answered questions with the Kedlinskis so long as I could be present so we could make sure they were not invading the administrative proceeding. There's a simple resolution to this, which is the thing every other law enforcement agency I've ever dealt with does. The FBI, the Marshal Service, is your attorney comes, particularly when you're a complainant against that very agency. For instance, under your scenario, the agency could call over. I could go to district court, file an employment complaint, and then the agency OPR investigators could come out and interrogate my client about those matters while there's a pending action. I understand you sometimes think you didn't get proper notice or whatever. I'm not sure that's our job to sort all that kind of thing out. But going back to what the complaint alleges, which was a violation of the USERRA, and again, whatever problems that these two plaintiffs had with the agency, it's just hard for me to connect it up. There's all this back and forth, but it's hard for me to connect it up to the basic allegation of the complaint. If there was some anti-military animus afoot here, because as far as I can tell, they're following a fairly standard set of rules, dismissing somebody who refuses to request an investigation or refuses to cooperate. It seems to me that the agency's proceeding according to a standard procedure, but I just have a difficulty locating an anti-military animus, which is what this statute is very laudably designed to prevent. Well, and if I may just finish this and I'll stop, Your Honor. What the statute does is— You've run over your time, but I want to make sure that you get your argument out. So why don't you give us a brief concluding statement, okay? Certainly. Your Honor, I fully understand the view of the court, but there are factual issues that are in dispute. First of all, over whether the Coast Guard ever actually granted any authority for Mr. Kedlinski to leave. That's a factual question. We disagree with that. And the second issue is the understanding premise that we have is the statute protects the military status of Mr. Kedlinski. So anything that interferes with that military status or those military obligations violates USERRA. And we can't think of anything that would violate USERRA more than an agency coming over and on less than 24 hours' notice demanding somebody come over the next day and be interviewed. All right. Mr. Burns, I thank you, and I'm going to ask Judge Floyd, do you have any questions you would like to ask of Mr. Burns? No, sir. Judge Groh, do you have any questions you would like to pose to Mr. Burns? No, sir. Thank you. All right. Mr. White, Mr. Burns, Ms. Kimball, we want to thank you all for your argument. Unfortunately, operating virtually, we're not able to come down and shake your hand the way we traditionally do. But we want you to understand we still appreciate your argument nonetheless. So thank you very much. And our court will take a brief recess. I want to go directly into the next case. And we'll ask the courtroom deputy to move us into the next case.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Gina M. Groh